Linden D. ANDERSON, Plaintiff–Appellant,

v.

Kenneth CONBOY, Investigations and Review Officer, Defendant,

United Brotherhood of Carpenters and Joiners of America, Sigurd Lucassen, General President, District Council of New York City and Vicinity, Frederick W. Devine, and Local 17, Defendants–Appellees.

Docket No. 97–7677.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 1997.

Decided Sept. 10, 1998.

---

Paul Schachter, Reinhardt & Schachter, Newark, NJ (Nancy Macirowski, of counsel), for Plaintiff–Appellant.

Lawrence R. Sandak, Sive Paget & Riesel, New York City (Michael S. Bogin, Sandra Song, of counsel), for Defendants–Appellees.

Before: WINTER, Chief Judge, LEVAL, Circuit Judge, and GOLDBERG,* Judge.

WINTER, Chief Judge:

Linden Anderson, a former Business Representative of Local 17 of the United Broth-

---

* The Honorable Richard W. Goldberg, of the United States Court of International Trade, sitting by designation.

erhood of Carpenters and Joiners ("UBC"), appeals from the dismissal of his complaint by Judge Haight. In that complaint, Anderson alleged, *inter alia*, that appellees violated 42 U.S.C. § 1981 by discharging him because he was not a citizen of the United States. Judge Haight held that Section 1981 does not prohibit alienage discrimination by private actors. The correctness of that ruling is the sole question on appeal.

Anderson is a citizen of Jamaica who immigrated to the United States in 1968. He began working for Local 17 in 1973. Local 17 is presently governed under the terms of a consent decree, otherwise not pertinent here, that gives various powers to Investigations and Review Officer Kenneth Conboy. In June 1992, Anderson was elected to the position of Business Representative of Local 17. Section 31(A) of the UBC Constitution provides in relevant part:

No member shall be eligible to be an officer or business representative, delegate or committee member unless such member is a citizen of the United States or Canada, and the member, to be eligible to serve in any such capacity, must be a citizen of the country in which the Local Union is located.

In August 1994, upon learning that Anderson was not a United States citizen, Conboy informed Anderson that he was ineligible to serve as Business Representative. Anderson was removed from his position on September 19, 1994.

Anderson then filed the instant complaint, claiming: (i) discrimination on the basis of alienage, in violation of 42 U.S.C. § 1981; (ii) discrimination on the basis of alienage, in violation of the New York City Human Rights Law; and (iii) violation of the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(5). The District Council and its President, Frederick W. Devine, filed cross-claims against Conboy for indemnification.

Acting under Federal Rule of Civil Procedures 12(b)(6), Judge Haight dismissed all

claims and cross-claims against Conboy, concluding that he was entitled to absolute immunity from suit for his conduct as court-appointed Investigations and Review Officer. *See Anderson v. Conboy,* No. 94 Civ. 9159, 1997 WL 177890, at *4–*8 (S.D.N.Y. April 14, 1997). Anderson does not appeal from that ruling. As to Anderson's claims against the remaining defendants, Judge Haight concluded that Anderson had abandoned his LMRDA claim, *See id.* at *9, and that Section 1981 does not prohibit private alienage discrimination, *See id.* at *9–*11. Having disposed of Anderson's federal claims, Judge Haight declined to exercise supplemental jurisdiction over the alienage discrimination claim under New York City Law. Anderson appeals only from the dismissal of his Section 1981 claim.

Section 1981, as amended by the Civil Rights Act of 1991, Pub.L. No. 102–166, § 101, 105 Stat. 1071, 1071–72, prohibits certain kinds of discrimination in the making and enforcement of contracts, including contracts of employment. The disputed issue here is whether it prohibits alienage discrimination by private parties. Prior to the 1991 amendment, the circuits were divided on the question. *Compare Duane v. GEICO,* 37 F.3d 1036 (4th Cir.1994) (before 1991 amendment, Section 1981 prohibited private discrimination against aliens) *with Bhandari v. First Nat'l Bank of Commerce,* 829 F.2d 1343 (5th Cir.1987) (en banc) (Section 1981 prohibits alienage discrimination under color of law but does not extend to discrimination by private actors), *vacated and remanded,* 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989) (in light of *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)), *reaffirmed on remand,* 887 F.2d 609 (5th Cir.1989) (per curiam).

Prior to the instant matter, we have had no occasion to consider the question. One district court in this circuit has held that the pre–1991 version of Section 1981 extended to alienage discrimination, but not to alienage discrimination by private parties, *see Ben–Yakir v. Gaylinn Assocs., Inc.,* 535 F.Supp. 543 (S.D.N.Y.1982) while another has held that it did not prohibit alienage discrimination by state or private actors, *see Rios v. Marshall,* 530 F.Supp. 351 (S.D.N.Y.1981).

Anderson argues that before the 1991 Civil Rights Act, Section 1981 prohibited (at least) state action that discriminated on the basis of alienage in the making and enforcement of contracts, and that the 1991 amendment extended Section 1981's coverage to private alienage discrimination. This post–1991 effect of Section 1981 is a question of first impression in this (or any) circuit, although two district courts have taken the position advocated by Anderson, *see Cheung v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 913 F.Supp. 248 (S.D.N.Y.1996); *Chacko v. Texas A & M Univ.,* 960 F.Supp. 1180 (S.D.Tex. 1997), *aff'd,* 149 F.3d 1175 (5th Cir.1998), while one has taken the opposite position. *See Murtaza v. New York City Health & Hosps. Corp.,* No. 97–CV–4554, 1998 WL 229253 (E.D.N.Y. Mar. 31, 1998).

■ We hold that Section 1981, at least since the 1991 amendment, proscribes private alienage discrimination with respect to the rights set forth in the statute. We therefore reverse.

## DISCUSSION

■ We review *de novo* a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). Section 1981[1] applies to all incidents of the contractual

---

1. Section 1981, as amended in 1991, is entitled "Equal rights under the law" and provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Prior to 1991, Section 1981(a) comprised the entire Section.

relationship, including contract terminations. *See* 42 U.S.C. § 1981(b). The question, therefore, is whether Anderson falls within the class of persons protected by Section 1981.

 It is established that Section 1981 prohibits discrimination based on race in the making and enforcement of contracts, *see Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), and extends to private as well as state actors in that regard. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 172, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 609, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Runyon v. McCrary,* 427 U.S. 160, 170–71, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Johnson,* 421 U.S. at 459–60, 95 S.Ct. 1716. The prohibition against racial discrimination encompasses discrimination based on ancestry or ethnic characteristics. *See Al–Khazraji,* 481 U.S. at 613, 107 S.Ct. 2022; *Magana v. Northern Mariana Islands,* 107 F.3d 1436, 1446–47 (9th Cir.1997). It is also settled that Section 1981 does not prohibit discrimination on the basis of gender or religion, *see Runyon,* 427 U.S. at 167, 96 S.Ct. 2586; national origin, *see Al–Khazraji,* 481 U.S. at 613, 107 S.Ct. 2022; *Von Zuckerstein v. Argonne Nat'l Lab.,* 984 F.2d 1467, 1472 (7th Cir. 1993); or age, *Kodish v. United Air Lines, Inc.,* 628 F.2d 1301, 1303 (10th Cir.1980).

Few cases have addressed whether Section 1981 prohibits discrimination on the basis of

alienage and, if so, whether that prohibition extends to private actors. As to the latter question, Section 1981 was amended by Section 101 of the Civil Rights Act of 1991 to provide that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). As we conclude later in this opinion, the amendment settles the latter question—whether the prohibition against alienage discrimination, if it exists, extends to private actors. However, we first address the more difficult question of whether discrimination on the basis of alienage was, at the time of the 1991 amendment to Section 1981, covered by the statute at all.

### 1. Section 1981 and Alienage Discrimination

Appellees first contend that the 1991 amendment's extension of Section 1981 to "nongovernmental discrimination" is irrelevant because Section 1981 does not prohibit alienage discrimination, public or private. There are few holdings on this issue but there is language in the caselaw to support this view. Many courts, ours included, have stated—or seemed to state—that a plaintiff must allege race discrimination to state a claim under Section 1981.[2] The language of these cases is not dispositive because in none of them was the issue of alienage discrimination directly at issue.[3] There is language in other cases, however, stating that Section 1981 does prohibit such discrimination.[4]

---

**2.** Among some recent examples, *see Bellows v. Amoco Oil Co.,* 118 F.3d 268, 274 (5th Cir.1997) (to establish Section 1981 claim, plaintiff must show, *inter alia,* that "he or she is a member of a racial minority" and "the defendant had an intent to discriminate on the basis of race"); *Little v. United Techs., Carrier Transicold Div.,* 103 F.3d 956, 961 (11th Cir.1997) ("It is well-established that § 1981 is concerned with racial discrimination"); *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996) (same as *Bellows* ); *Bisciglia v. Kenosha Unified Sch. Dist. No. 1,* 45 F.3d 223, 229 (7th Cir.1995) ("Section 1981 only provides relief for discrimination based on one's race"); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993) (per curiam) (same as *Bellows* ); *Daemi v. Church's Fried Chicken, Inc.,* 931 F.2d 1379, 1387 n. 7 (10th Cir.1991) (Section 1981 outlaws "only discrimination on the basis of race"); *Evans v. McKay,* 869 F.2d 1341, 1344 (9th Cir.1989) (it "is re-

quired in a section 1981 action" that plaintiffs "show intentional discrimination on account of race"); *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1412 n. 7 (D.C.Cir.1988) (Section 1981 plaintiff must prove different treatment from similarly situated persons "because of his race").

**3.** Indeed, we have found only two cases in which courts, in the face of a claim of alienage discrimination, held that Section 1981 is limited to claims only of race discrimination. *See Murtaza,* 1998 WL 229253; *Rios,* 530 F.Supp. 351.

**4.** *See, e.g., St. Louis v. Alverno College,* 744 F.2d 1314, 1317 (7th Cir.1984) (where plaintiff alleged gender discrimination, court stated that Section 1981 "applies only to alleged discrimination on the basis of race or alienage"); *Carrillo v. Illinois Bell Tel. Co.,* 538 F.Supp. 793, 795 (N.D.Ill.1982)

These cases are also less than dispositive because they did not involve claims of alienage discrimination.[5]

However, the language, history, and structure of Section 1981, as well as caselaw directly addressing alienage discrimination, convinces us that, at the time · of the 1991 amendment, Section 1981 prohibited (at least) governmental alienage discrimination.

### a) Language

Section 1981 provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute's juxtaposition of "[a]ll" and "white" suggests that it prohibits race discrimination, *cf. McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), while its juxtaposition of "persons" and "citizens" suggests that it prohibits alienage discrimination. A "person" who is denied employment because he or she is not a citizen cannot be said to enjoy the "same right ... to make and enforce contracts ... as is enjoyed by white citizens". *Cf. United States v. Gaggi*, 811 F.2d 47, 56 (2d Cir.1987) (comparing use of "citizen" in 18 U.S.C. § 241 and "inhabitant" in 18 U.S.C. § 242 and stating "[w]e presume that the use of different terminology within a body of legis-

lation evidences a Congressional purpose to differentiate").

This is not the only reading permitted by the statutory language, however. The use of "all persons"—as opposed to, for example, the phrase "all citizens" as in Section 1982[6] —may be read to mean only that non-citizens legally residing in the United States have the same rights as citizens to be free from racial discrimination. *See Baca v. Butz*, 394 F.Supp. 888, 890 n. 2 (D.N.M.1975) (use of term "persons" was intended "to bring within the protected class aliens who are discriminated against due to their race"). *But see De Malherbe v. International Union of Elevator Constructors*, 438 F.Supp. 1121, 1137 n. 17 (N.D.Cal.1977) (applying Section 1981 only to claims of race discrimination would "make meaningless" Congress's decision to protect "all persons" rather than solely citizens); John Harrison, *Reconstructing the Privileges or Immunities Clause*, 101 Yale L.J. 1385, 1446 (1992) (Section 1981's use of "all persons" instead of "all citizens" refutes argument that statute "protects aliens from race discrimination but not from discrimination based on the fact that they are aliens").[7]

The language of the statute, therefore, is consistent with the argument that Section 1981 proscribes alienage discrimination but is not dispositive of the issue.

---

(where complaint alleged discrimination based on sex, race, and national origin, court responded that Section 1981 "encompasses claims of discrimination based on race and alienage"); *Hollander v. Sears, Roebuck & Co.*, 392 F.Supp. 90, 94 n. 5 (D.Conn.1975) (where complaint alleged race discrimination, court noted that it has "become clear that § 1981 provides a cause of action for persons discriminated against on the basis of alienage").

**5.** We also note that heavy reliance cannot be placed upon Justice Brennan's concurring opinion in *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 614, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), which asserted that "discrimination based on *birthplace alone* is insufficient to state a claim under § 1981." *Id.* Alienage discrimination is distinct from both national-origin and birthplace discrimination. *See, e.g., Cheung v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 913 F.Supp. 248, 252 (S.D.N.Y.1996). Thus, in *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), the Supreme Court

concluded that Title VII's prohibition against discrimination based on national origin does not reach discrimination based on alienage.

**6.** 42 U.S.C. § 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

**7.** The fact that the statute uses the term "all persons" rather than "all citizens" is insignificant in isolation; the significance of that choice of language derives from the later use in the statute of the term "white citizens" rather than "white persons." Were Section 1981 to provide that "all persons" have the same right to make and enforce contracts as "white persons," the statute's scope would be relatively clear: the statute would prohibit race discrimination in the making and enforcement of contracts and aliens, like citizens, would have standing to enforce that prohibition.

b) History and Structure

Section 1981 is derived from both Section 1 of the Civil Rights Act of 1866 ("1866 Act"), ch. 31, § 1, 14 Stat. 27,[8] and Section 16 of the Voting Rights Act of 1870 ("1870 Act"), ch. 114, § 16, 16 Stat. 140, 144.[9] *See Runyon,* 427 U.S. at 169 & n. 8, 96 S.Ct. 2586; *see also General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 384–90 & 390 n. 17, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Choudhury v. Polytechnic Inst. of N.Y.,* 735 F.2d 38, 42 (2d Cir.1984); *Duane,* 37 F.3d at 1038; *Bhandari,* 829 F.2d at 1350 (" § 1981 is a redactor's amalgam of two different enactments, each aimed at a different group.").[10]

To eliminate the badges and incidents of slavery, the 1866 Act was passed pursuant to Section 2 of the Thirteenth Amendment to the Constitution, which had been ratified in 1865. *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 439–40, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *The Civil Rights Cases,* 109 U.S. 3, 20, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Accordingly, Section 1 of the 1866 Act applied

only to discrimination based on race. *See Espinoza v. Hillwood Square Mut. Ass'n,* 522 F.Supp. 559, 562 (E.D.Va.1981). This limitation is the plain import of its language—"citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude"—and of its legislative history. *See General Bldg. Contractors Ass'n,* 458 U.S. at 384, 102 S.Ct. 3141 (" 'The legislative history of the 1866 Act clearly indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality.' ") (quoting *Georgia v. Rachel,* 384 U.S. 780, 791, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966)); *see generally* Harrison, 101 Yale L.J. at 1402–05. Moreover, because Section 1 of the 1866 Act was passed pursuant to the Thirteenth Amendment—which is not limited to state action—it applies to race discrimination by private actors. *See Runyon,* 427 U.S. at 170–72, 96 S.Ct. 2586; *Jones,* 392 U.S. at 436–38, 88 S.Ct. 2186; *Choudhury,* 735 F.2d at 42.

**8.** Section 1 of the 1866 Act provided:

"That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and *such citizens, of every race and color,* without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, *shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence,* to inherit, purchase, lease, sell, hold, and convey real and personal property, *and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other,* any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

(emphasis added.) The emphasized portion of Section 1, which was re-enacted by Section 18 of the Voting Rights Act of 1870, is similar, but not identical, to the current 42 U.S.C. § 1981(a). The portions of Section 1 concerning the rights to "inherit, purchase, lease, sell, hold, and convey real and personal property," were codified to create what is now 42 U.S.C. § 1982. *See supra* note 6; *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 422 & n. 28, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

**9.** Section 16 of the 1870 Act provided:

"And be it further enacted, That *all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other,* any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void."

(emphasis added.) The emphasized portion is identical to the present 42 U.S.C. § 1981(a).

**10.** Section 1 of the 1866 Act and Section 16 of the 1870 Act were later combined and codified in Section 1977 of the Revised Statutes of 1874 and ultimately recodified in 42 U.S.C. § 1981. *See Runyon,* 427 U.S. at 168 n. 8, 96 S.Ct. 2586. The "property clause" of Section 1, which applied only to "citizens" and was not included in Section 16, was codified in Section 1978 of the Revised Statutes of 1874 and ultimately became 42 U.S.C. § 1982. *See Jones,* 392 U.S. at 422 & n. 28, 88 S.Ct. 2186.

Because Section 1 of the 1866 Act was addressed only to race discrimination and because its protections extended only to "citizens," any prohibition against alienage discrimination must be derived from Section 16 of the 1870 Act. *See Bhandari*, 829 F.2d at 1345–46. The 1870 Act was passed pursuant to the Fourteenth Amendment, which was ratified in July 1868. *See General Bldg. Contractors Ass'n*, 458 U.S. at 386, 389, 102 S.Ct. 3141. (Section 18 of the 1870 Act re-enacted Section 1 of the 1866 Act.[11]) Section 16 of the 1870 Act, a portion of which is identical to what is now 42 U.S.C. § 1981(a), used language similar to that found in Section 1 of the 1866 Act, but with one difference of particular relevance here: rather than protecting "citizens, of every race and color," Section 16 protected "all persons within the jurisdiction of the United States."[12]

The use of "persons" rather than "citizens" was deliberate. Because Section 16 was at least in part based on the Fourteenth Amendment,[13] the change in language reflects the language of that newly enacted Amendment, which extended the country's guarantee of the equal protection of the laws to "any person within its jurisdiction." U.S. Const. amend. XIV; *see General Bldg. Con-*

*tractors Ass'n*, 458 U.S. at 386, 102 S.Ct. 3141. Moreover, the legislative history of the 1870 Act indicates that the change from "citizens" to "persons" reflected the circumstances motivating the enactment of Section 16. The immediate purpose of Section 16 was to alleviate the plight of Chinese immigrants in California, who were burdened by state laws restricting their ability to work, removing their right to give testimony at trial, and otherwise discouraging them from immigrating to and living in California. *See generally* Charles J. McClain, Jr., *The Chinese Struggle for Civil Rights in Nineteenth Century America: The First Phase, 1850–1870*, 72 Cal. L.Rev. 529, 539–64 (1984).

Senator Stewart of Nevada, the sponsor of S. 365—which, with minor revisions, would become Sections 16 through 18 of the 1870 Act, *see* Cong. Globe, 41st Cong., 2d Sess. 1536 (1870) (text of S. 365); *Runyon*, 427 U.S. at 196–201, 96 S.Ct. 2586 (White, J., dissenting) (discussing process culminating in enactment of 1870 Act)—viewed S. 365 as "simply extend[ing] to foreigners, not citizens, the protection of our laws where the State laws deny them the equal civil rights enumerated in the first section [of the 1866

11. Section 18 of the 1870 Act provided:

And be it further enacted, That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April nine, eighteen hundred and sixty-six, is hereby re-enacted; and sections sixteen and seventeen hereof shall be enforced according to the provisions of said act.

12. Another major difference between Section 1 of the 1866 Act and Section 16 of the 1870 Act is that the latter "omitted language contained in the 1866 Act, and eventually codified as § 1982, guaranteeing property rights equivalent to those enjoyed by white citizens." *General Bldg. Contractors Ass'n*, 458 U.S. at 386, 102 S.Ct. 3141. *See supra* notes 8 & 9. This omission was intentional; Senator Stewart, the sponsor of the bill that would become Section 16, stated that his bill "has nothing to do with property or descent. We left that part of the law out." Cong. Globe, 41st Cong., 2d Sess. 1536 (1870). *See generally* Harrison, 101 Yale L.J. at 1442–47.

13. In *Takahashi v. Fish & Game Commission*, 334 U.S. 410, 420, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), the Supreme Court stated that Section

1981 rests "in part" on the Fourteenth Amendment, indicating that it rests also on some other constitutional authority. Although the Court in *Takahashi* was almost certainly referring by negative implication to the Thirteenth Amendment, at least one commentator has suggested that Section 1981 may perhaps rest in part on the naturalization power found in Article I, section 8. *See Developments in the Law—Section 1981*, Harv. C.R.-C.L. L.Rev. 29, 96–97 (1980) (hereinafter "*Section 1981* "). *See also Guerra v. Manchester Terminal Corp.*, 498 F.2d 641, 655 n. 32 (5th Cir.1974) (stating that, "[w]hatever constitutional foundations motivated the legislators who extended § 1981's predecessor to aliens, the Supreme Court has on several occasions suggested that authority to do so could be found in Congress's exclusive constitutional power over immigration and naturalization"). *But cf. Bhandari v. First Nat'l Bank of Commerce*, 829 F.2d 1343 (5th Cir.1987) (en banc) (7–6 decision overruling *Guerra* on other grounds), *vacated*, 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989), *reinstated on remand*, 887 F.2d 609 (5th Cir.1989) (per curiam). Because neither party questions Congress's constitutional power to extend Section 1981 to private alienage discrimination, we need express no view as to the source of that power.

Act]." [14] Cong. Globe, 41st Cong., 2d Sess. 1536 (1870). Senator Stewart indicated that the plight of the Chinese aliens was foremost in his thinking. For example, when adding S. 365 as an amendment to a subsequent bill, Senator Stewart stated with reference to the portion of the bill that would become Section 16 of the 1870 Act:

> Then the other provision which has been added is one of great importance. It is of more importance to the honor of this nation than all the rest of this bill. We are inviting to our shores, or allowing them to come, Asiatics. We have got a treaty allowing them to come. . . . While they are here I say it is our duty to protect them. I have incorporated that provision in this bill . . . . It is as solemn a duty as can be devolved upon this Congress to see that those people are protected, to see that they have the equal protection of the laws, notwithstanding that they are aliens.

*Id.* at 3658; *see also id.* at 3570 (statement of Sen. Sherman) ("[W]e must protect the Chinese against the local laws of California.").

The desire to protect Chinese immigrants from discrimination, however, is as consistent with prohibiting racial discrimination as with prohibiting alienage discrimination. While the Chinese immigrants were certainly aliens in 1870—"Chinese persons or persons of Chinese descent" were not given the right to naturalize until 1943, *see Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 412 n. 1, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948) (quoting 8 U.S.C. § 703 (repealed))—there is considerable support for the proposition that they were viewed as a "race" rather than merely as a group of aliens. *See Al–Khazraji*, 481 U.S. at 610–13, 107 S.Ct. 2022 (indicating that nineteenth-century conceptions of "race" were different from those today); *cf. United States v. Wong Kim Ark*, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 *passim* (1898) (referring repeatedly to "Chinese race"). However, other remarks in the legislative record suggest that Congress intended to extend Section 16's protections to groups other than the Chinese. For example, Senator Stewart commented that, under S. 365, "we will protect Chinese aliens *or any other aliens whom we allow to come here.*" Cong. Globe, 41st Cong., 2d Sess. 3658 (emphasis added); *see also id.* at 1536 (Section 16 "extends to foreigners, not citizens, the protection of our laws"). These statements indicate that, whatever the initial motivation behind the legislation, Section 16 was to apply to all aliens. Because not all aliens were likely to be subjected to race discrimination, one may infer that a prohibition on alienage discrimination was contemplated.

The most convincing evidence of such an intent, however, is the structure of the 1870 Act itself. Section 17 of the 1870 Act, which, like Section 16, is drawn from S. 365, provided for criminal sanctions for any person who, under color of law, subjected "any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties *on account of such person being an alien, or by reason of his color or race,* than is prescribed for the punishment of citizens." § 17, 16 Stat. at 144

---

**14.** These remarks have been relied upon by several courts as suggesting that Section 1981 applies to claims of alienage discrimination. *See, e.g., Bhandari*, 829 F.2d at 1348 (Senator Stewart's remarks make clear that Section 16 "was to curtail state action discriminating unfairly against aliens"); *De Malherbe v. International Union of Elevator Constructors*, 438 F.Supp. 1121, 1137–40 (N.D.Cal.1977) (legislative history shows that Section 16 prohibited state alienage discrimination but not private alienage discrimination). Some courts have even concluded that, because Section 1 of the 1866 Act has been interpreted to reach both private and public discrimination and because Senator Stewart intended Section 16 to "extend" Section 1 to aliens, Section 16 must be interpreted as reaching both public and private alienage discrimination. *See,*

*e.g., Duane v. GEICO*, 37 F.3d 1036, 1042–43 (4th Cir.1994); *Espinoza*, 522 F.Supp. at 564.

However, a contrary interpretation is not foreclosed by Senator Stewart's remarks. Because Section 1 of the 1866 Act applied only to race discrimination and because Senator Stewart commented that Section 16 merely "extends" to aliens the protections afforded by Section 1 of the 1866 Act, one might infer that the new act protects aliens only from race discrimination but not from alienage discrimination. *See Section 1981, supra* note 13, at 91 ("Nothing in Senator Stewart's remarks or in the legislative record is inconsistent with the view that Congress intended only to provide aliens with the same protection it had already provided to citizens—protection against racial discrimination.").

(emphasis added).[15] Although Section 17 is a criminal statute and has no direct application here, it was part of the same bill as Section 16. Moreover, Section 17 by its plain language enforced the specific rights enumerated in Section 16. If, therefore, Section 16 did not prohibit discrimination on the basis of alienage, Section 17, imposing criminal penalties for depriving a person of those specific rights "on account of such person being an alien," would be so anomalous as to make no sense.

### c) Caselaw

Our conclusion that Section 1981 has always prohibited alienage discrimination is supported by the decisions that have addressed the issue directly. The two courts of appeals to have addressed the question, the Fifth and Fourth, disagreed as to whether the pre–1991 version of Section 1981 prohibited private alienage discrimination. They agreed, however, that prior to the 1991 amendment it prohibited alienage discrimination under color of law.

The Fifth Circuit first addressed the issue in *Guerra v. Manchester Terminal Corporation*, 498 F.2d 641 (5th Cir.1974), concluding that Section 1981 extends to private alienage discrimination. Thirteen years later, in *Bhandari v. First National Bank of Commerce*, 829 F.2d 1343 (5th Cir.1987), the full court, by a seven-to-six vote, overruled *Guerra* and held that Section 1981 curtailed only state action discriminating against aliens, not private discrimination.

When *Bhandari* was decided, it was clear that Section 1981 prohibited race discrimination by private actors. However, several factors appear to have persuaded the majority in *Bhandari* not to adopt a parallel rule with respect to alienage discrimination. First, while the prohibition of private race discrimination derives from Section 1 of the 1866 Act, *Bhandari* correctly found that that act "had nothing to say on the subject of alienage." 829 F.2d at 1345. The court viewed the legislative history of Section 16 of the 1870 Act, the source of the prohibition against alienage discrimination, as limiting Section 1981's protection of aliens to state action. *See id.* at 1346–48. Second, the majority believed that Supreme Court's decisions in *Jones* and *Runyon*, which extended Section 1981 to private race discrimination, were wrongly decided and therefore should be limited to their narrow holdings. *See id.* at 1349 (although Supreme Court reasoned in particular manner in context of race discrimination, court of appeals not "obliged to extend that reasoning, when it seems to us— and not to us only—severely flawed, to a new series of situations to which the Court has not yet spoken"); *see id.* (it is "beyond serious dispute that the reasoning of *Jones* and [*Runyon* ] cannot stand of its own force"); *see id.* at 1352–53 (Higginbotham, J., concurring) (court is justified in not extending

<hr>

**15.** Section 17 provided in full:

> And be it further enacted, That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court.

Section 17 is now codified, as amended, at 18 U.S.C. § 242. *See United States v. Price*, 383 U.S. 787, 802–03, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). The principal amendments include: substitution of the term "willfully subjects" for "shall subject, or cause to be subjected"; a broadening of the protected rights from those enumerated in Section 17 to include "any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States"; and the inclusion of a felony provision where bodily injury results from the violation of the statute. *See* 18 U.S.C. § 242.

*Price* tells us that the present Section 242 is derived from Section 2 of the 1866 Act, and that Section 17 of the 1870 Act was a mere "re-enactment" of Section 2. 383 U.S. at 802, 86 S.Ct. 1152; *accord Screws v. United States*, 325 U.S. 91, 98–99, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (plurality opinion). While that may be the case, the provision that concerns us here—the prohibition against discrimination "on account of such person being an alien"—derives exclusively from Section 17 of the 1870 Act. *Cf. United States v. Maravilla*, 907 F.2d 216, 226 (1st Cir. 1990) (Section 17 "changed other words in [Section 2] to make clear that the statute protected the rights of 'aliens' ").

*Jones* and *Runyon* to alienage because those cases were wrongly decided).[16] Finally, the Fifth Circuit relied upon legislation enacted after Section 1981—particularly Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1324a *et seq.*—to infer that Congress did not believe that Section 1981 prohibited private alienage discrimination. *See id.* at 1351; *see also De Malherbe,* 438 F.Supp. at 1137 (Section 16's legislative history "establishes that it prohibited discrimination against aliens where states engaged in the discriminatory conduct but that the prohibition of alienage discrimination did not extend to conduct of private individuals") (footnote omitted).

In *Duane v. GEICO,* 37 F.3d 1036 (4th Cir.1994), the Fourth Circuit held that the pre–1991 version of Section 1981 prohibited private as well as state alienage discrimination. Concluding that the legislative history of Section 16 of the 1870 Act was considerably more ambiguous than the Fifth Circuit indicated in *Bhandari, see* 37 F.3d at 1041–42, *Duane* relied principally on the linguistic and structural similarities between the 1866 Act, which, according to the Supreme Court, was intended to reach private discrimination, and the 1870 Act. *See id.* at 1042. Also, because Section 1981 codified into a single provision both Section 16 of the 1870 Act and Section 1 of the 1866 Act, the Fourth Circuit determined that it should be interpreted to prohibit alienage discrimination in the same manner and to the same extent as it prohibits race discrimination. *See id.* at 1043; *see also Espinoza,* 522 F.Supp. at 564 (similarity of language and structure of 1866 and 1870 Acts, as well as Senator Stewart's desire to extend 1866 Act to aliens, supports conclusion that Section 1981 prohibits private alienage discrimination).

The 1991 amendment to Section 1981, which, as discussed *infra,* makes clear that the rights enumerated in Section 1981(a) are protected from private as well as governmental discrimination, simplifies our consideration of the scope of Section 1981. In light of the 1991 amendment, the reasoning in *Bhandari,* limiting the prohibition on alienage discrimination to state action, has been legislatively superseded. *See Cheung,* 913 F.Supp. at 251 ("[T]he enactment of section 1981(c) in 1991 mooted the arguments made in *Bhandari* and *Duane* over whether Congress, in enacting the provisions which later became present-day section 1981, meant to prohibit private citizenship discrimination."). For our purposes, therefore, it is sufficient to note that the panel in *Duane* and the thirteen judges in *Bhandari* unanimously agreed that, prior to the 1991 amendment, Section 1981 prohibited alienage discrimination under color of law.[17] *See also Developments in the Law—Immigration Policy and the Rights of Aliens,* 96 Harv. L.Rev. 1400, 1427 & n. 194 (1983) (hereinafter *"Immigration Policy "*) ("[T]he weight of authority supports the application of section 1981 to state discrimination on the basis of alienage"; collecting cases); *Developments in the Law—Section 1981,* Harv. C.R.-C.L. L.Rev. 29, 92 & n. 130 (1980) (hereinafter *"Section 1981 "*) lower federal courts "have almost unanimously concluded that alienage-based discrimination is prohibited" under Section 1981; collecting cases).

Moreover, although the Supreme Court has never squarely held that Section 1981 bars discrimination—whether state or private—on the basis of alienage, it has in two instances cited Section 1981 while invalidating state laws that discriminated against aliens. First, in *Takahashi v. Fish & Game*

---

**16.** Sixteen months after *Bhandari* was decided, the Supreme Court, in *Patterson v. McLean Credit Union,* declined an invitation to overrule *Runyon.* The Court then vacated the judgment in *Bhandari* and remanded the case "for further consideration in light of *Patterson."* 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989). On remand, the Fifth Circuit reinstated its earlier opinion. *See* 887 F.2d 609, 610 (5th Cir.1989) (per curiam).

**17.** Of course, a claim against a state actor would have to be brought pursuant to 42 U.S.C. § 1983, which provides the "exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598. *See infra* Note 18 (noting circuit split over whether holding in *Jett* survives enactment of Section 1981(c)). A claim against a private actor could be brought directly under Section 1981.

*Comm.,* the Court invalidated a California law that banned the issuance of commercial fishing licenses to "any person ineligible to citizenship." 334 U.S. at 413, 68 S.Ct. 1138. A Japanese resident of California—ineligible at that time for citizenship under federal law, *see id.* at 412 n. 1, 68 S.Ct. 1138—challenged the constitutionality of the state statute. Although the Court struck down the law, the basis for the decision was unclear, appearing to rely on both the Equal Protection Clause of the Fourteenth Amendment and Congress's exclusive power under Article I to control immigration. *See* U.S. Const. art. I, § 8, cl. 4. The following discussion concerned Section 1981:

> State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid. Moreover, Congress, in the enactment of a comprehensive legislative plan for the nationwide control and regulation of immigration and naturalization, has broadly provided: [Text of Section 1981, then codified at 8 U.S.C. § 41]
>
> The protection of this section has been held to extend to aliens as well as to citizens. Consequently *the section and the Fourteenth Amendment on which it rests in part protect "all persons" against state legislation bearing unequally upon them either because of alienage or color.* The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in the country shall abide "in any state" on an equality of legal privileges with all citizens under non-discriminatory laws.

334 U.S. at 419–20, 68 S.Ct. 1138 (emphasis added) (footnotes and citation omitted). *Takahashi* thus implicitly supports the proposition that the pre–1991 Section 1981 proscribed state laws that discriminate on the basis of alienage.

Second, in *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), the Court invalidated state welfare laws that either denied benefits to non-citizens or subjected them to residency requirements to which citizens were not subjected. The Court, relying in part on *Takahashi,* determined that the laws violated both the Equal Protection Clause, *see* 403 U.S. at 370–76, 91 S.Ct. 1848, and "overriding national policies" in the area of immigration. *Id.* at 376–80, 91 S.Ct. 1848. As to the latter, the Court stated that "State laws that restrict the eligibility of aliens for welfare benefits merely because of their alienage conflict with these overriding national policies" set forth in, *inter alia,* Section 1981 and are thus impermissible. *Id.* at 378, 91 S.Ct. 1848. Like *Takahashi, Graham* did not speak directly to the scope of Section 1981, *see Ben–Yakir,* 535 F.Supp. at 545 n. 1) (*Graham* "did not rely on [Section 1981] as a basis for the action"), but used reasoning that supports the view that the pre–1991 version of Section 1981 prohibited state alienage discrimination. *See Duane,* 37 F.3d at 1040 (*Graham* and *Takahashi* "established that section 1981 prohibits at least public discrimination against aliens"); *see also Bhandari v. First Nat. Bank of Commerce,* 494 U.S. 1061, 1061, 110 S.Ct. 1539, 108 L.Ed.2d 778 (1990) (White, J., dissenting from denial of certiorari) ("Prior cases," citing *Graham* and *Takahashi,* "have indicated that § 1981 prohibits official discrimination against aliens.... Certiorari should be granted to settle whether § 1981 proscribes private alienage discrimination").

Indeed, we know of only two cases, *Murtaza v. New York City Health & Hosps. Corp.,* No. 97–CV–4554, 1998 WL 229253 (E.D.N.Y. Mar. 31, 1998), and *Rios v. Marshall,* 530 F.Supp. 351 (S.D.N.Y.1981), in which courts have directly held that Section 1981 does not prohibit alienage discrimination, whether governmental or private. *See generally Immigration Policy,* 96 Harv. L.Rev. at 1427 & n. 194 (collecting cases indicating that Section 1981 prohibits alienage discrimination; citing only *Rios* for contrary proposition). In *Rios,* the district court concluded that because the plaintiffs had alleged "discrimination on the basis of citizenship, not race," they had not stated a claim for relief under Section 1981. 530 F.Supp. at 360–61. In support of that conclusion, *Rios* quoted *Jones* as stating that Section 1982 " 'deals only with

racial discrimination,'" *id.* at 360 (quoting *Jones,* 392 U.S. at 413, 88 S.Ct. 2186), and reasoned that because Section 1982 is the "companion section" to Section 1981, Section 1981 must also require an allegation of racial discrimination. *Id.* Such reliance on Section 1982, however, is misplaced. Section 1982 is derived entirely from Section 1 of the 1866 Act and is addressed only to "citizens." *See supra* notes 6, 8, 9, and 12. Because Section 1981 is derived in part from Section 16 of the 1870 Act and is addressed to "persons," the fact that Section 1982 prohibits only racial discrimination is not dispositive of the scope of Section 1981. Accord *Murtaza.*[18]

The caselaw, therefore, when combined with the language of Section 1981 and the legislative history and structure of the 1870 Act, bolsters our conclusion that the pre–1991 version of Section 1981 prohibited discrimination by state actors on the basis of alienage.

### 2. *The Civil Rights Act of 1991*

The Civil Rights Act of 1991 amended Section 1981 by redesignating the existing text as Section 1981(a) and by adding subsections (b) and (c). *See supra* note 1. Section 1981(c) provides that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). Because, as we conclude above, Section 1981 already protected the designated rights from alienage-based impairment by state laws, Section 1981(c)'s plain language extends that protection to cover private discrimination affecting those rights on the basis of alienage. Had Congress intended to limit Section 1981(c) to claims of race discrimination, it could easily

have drafted the subsection to provide that "[t]he rights protected by this section are protected against impairment by nongovernmental *race* discrimination. . . ." It did not do so, however.

■■ Normally, "[w]hen the words of a statute are unambiguous, . . . 'judicial inquiry is complete.'" *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)); *accord United States v. Gonzales,* 520 U.S. 1, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997); *Pierpoint v. Barnes,* 94 F.3d 813, 817 (2d Cir.1996). However, in "rare and exceptional circumstances," such as where a contrary legislative intent is clearly expressed, we may deviate from a statute's plain language to avoid defeating that clear intent. *Ardestani v. INS,* 502 U.S. 129, 135, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991); *accord Reves v. Ernst & Young,* 507 U.S. 170, 177, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993); *Greene v. United States,* 79 F.3d 1348, 1356 (2d Cir.1996); *United States v. Kinzler,* 55 F.3d 70, 72 (2d Cir. 1995); *O'Connell v. Hove,* 22 F.3d 463, 468 (2d Cir.1994).

Appellees ask us to ignore the plain language of Section 1981(c), arguing that the legislative history "conclusively demonstrate[s] that the 1991 amendments were not intended to bring private alienage discrimination within the scope of Section 1981," Appellees' Brief at 22, and that a literal interpretation of Section 1981(c) "would undermine the comprehensive legislative scheme established by the Immigration Reform and Control Act." Appellees' Brief at 28. We address each of these arguments in turn.[19]

---

**18.** We also believe that the district court in *Rios* understated the significance of *Takahashi. See Rios,* 530 F.Supp. at 361 n. 9 (suggesting that *Takahashi* merely establishes that aliens are protected from racial discrimination by Section 1981, not that they are protected from alienage discrimination). Similarly, we are not persuaded by the reasoning in *Murtaza,* which adopted in large part this reading of *Takahashi. See Murtaza,* 1998 WL 229253, at *10 ("*Rios*' treatment of *Takahashi* appears to be correct."). *Murtaza* also relied on the perceived inconsistencies between Section 1981 and the Immigration

Reform and Control Act of 1986. We address that argument below.

**19.** Section 1981(c) may be ambiguous as to whether it creates an implied private right of action against state actors under Section 1981, statutorily overruling *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), which held that 42 U.S.C. § 1983 provides the exclusive federal remedy against municipalities for violation of the rights set forth in Section 1981(a). See Note 17, *supra; compare Federation of African Am. Con-*

### a) Legislative History

We conclude that the legislative history is not contrary to the plain language of Section 1981(c), much less so clearly contrary, as to justify ignoring that language. The 1991 amendments were motivated principally by Congress's disagreement with *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). *See* House Comm. on the Judiciary, Civil Rights Act of 1991, H.R.Rep. No. 102–40(II), at 1 (1991) *reprinted in* 1991 U.S.C.C.A.N. 694, 694. In *Patterson*, the Court interpreted Section 1981 as not reaching conduct occurring after an employment contract is formed, such as "breach of the terms of the contract or imposition of discriminatory working conditions." 491 U.S. at 177, 109 S.Ct. 2363. Section 1981(b) was enacted to clarify that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Clearly, neither this subsection nor its legislative history bears directly on the issue here.

The legislative history of Section 1981(c) is sparse. A Report by the House Committee on Education and Labor explains that Section 1981(c) "confirms section 1981's coverage of both public and private sector employment." *See* H.R.Rep. No. 102–40(I), at 92 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 630. A Report by the House Committee on the Judiciary states that Section 1981(c)

> is intended to codify *Runyon v. McCrary*. In *Runyon*, the Court held that Section 1981 prohibited intentional racial discrimination in private, as well as public, contracting. The Committee intends to prohibit racial discrimination in all contracts, both public and private.

H.R.Rep. No. 102–40(II), at 37 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 731. Appellees rely on a supposed negative implication of this statement, namely that the Judiciary Committee's use of the term "racial discrimination" and its citation to *Runyon* indicate that Congress did not intend Section 1981(c) to apply to claims of alienage discrimination.

This somewhat tortured argument hardly overrides the statutory language.[20] The committee reports show, at most, only that Congress was focused on claims of race discrimination and that the legislative history is silent regarding alienage discrimination. Appellees find this silence regarding alienage discrimination to be significant. However, we cannot infer from this silence either that Congress was unaware of the potential implications of subsection (c) with regard to alienage discrimination or that, had it been aware, it would have limited subsection (c) only to claims of race discrimination.[21] This type of speculation is beyond our role as a court. To

---

*tractors v. City of Oakland*, 96 F.3d 1204, 1205 (9th Cir.1996) (Section 1981(c) overrules *Jett* ), with *Dennis v. County of Fairfax*, 55 F.3d 151, 156 n. 1 (4th Cir.1995) (*Jett* unaffected by Section 1981(c)). However, this ambiguity has no bearing on the issues before us.

**20.** Appellees also rely on a statement in the House Education and Labor Committee Report declaring that one of the purposes of the 1991 Civil Rights Act generally was to "respond to the Supreme Court's recent decisions by restoring federal civil rights protections against employment discrimination." H.R.Rep. No. 102–40(I), at 14 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 552. Appellees argue that, because Congress merely sought to "restore" Section 1981's protections, Section 1981(c) should not be extended to private alienage-discrimination claims. This is hardly compelling evidence that Congress's intent was contrary to the plain language of subsection (c). Moreover, the 1991 Civil Rights Act itself, in contrast to the House Education and Labor Committee Report, states as one of its purposes "to respond to recent decisions of the Supreme Court by *expanding* [not simply restoring] the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." Pub.L. No. 102–166, § 3(4), 105 Stat. 1071, 1071 (1991) (emphasis added).

**21.** Although we are willing to assume, *arguendo*, that Congress was unaware of the impact of Section 1981(c) on claims of alienage discrimination, we note that the House Education and Labor Committee Report cited two cases—*Runyon* and *Bhandari*—for the proposition that Section 1981 protects "Americans" from "intentional *race* discrimination in public and private contractual relations." *See* H.R.Rep. No. 102–40(I), at 89–90 & 90 n. 85 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 627–28 & 628 n. 85 (emphasis in original). As our discussion in Part I(c) indicated, *Bhandari* was an alienage discrimination case.

be sure, one would expect radical alterations of existing law, if intended by Congress, to be accompanied by explicit congressional consideration of the effects, and a silent legislative history in those circumstances might give some pause. However, the extension of a prohibition on state alienage discrimination to private parties is not in our view a radical alteration of existing law. *Cf. United States v. Phillips,* 19 F.3d 1565, 1581 (11th Cir.1994) ("Congress is presumed to be knowledgeable about existing case law pertinent to any legislation it enacts, and about the basic rules of statutory construction.") (citations omitted).

b) Conflict with Immigration Laws

Appellees also argue that the plain language of Section 1981(c) should be disregarded because it conflicts with, and would undermine, the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1324a *et seq.* ("IRCA"). The IRCA both imposes sanctions against employers who knowingly hire or continue to employ aliens not authorized to work in the United States, *see* 8 U.S.C. § 1324a(a), and prohibits discrimination on the basis of national origin or citizenship status in the hiring and firing of employees. *See id.* § 1324b(a). As to the latter provision, the IRCA is structurally and procedurally similar to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.. See General Dynamics Corp. v. United States,* 49 F.3d 1384, 1384–85 (9th Cir.1995). In fact, as to national-origin discrimination, the IRCA expressly does not apply if the individual is covered under Title VII. *See* 8 U.S.C. § 1324b(a)(2)(B). No such exemption is necessary with respect to citizenship discrimination, of course, because citizenship discrimination is not covered by Title VII. It was this omission from Title VII, in fact, that prompted passage of the IRCA. *See* H.R.Rep. No.

99–682(I), at 70, *reprinted in* 1986 U.S.C.C.A.N. 5649, 5674.

Although the protections afforded by the IRCA overlap to some extent with those provided by Section 1981, such an overlap does not constitute a conflict between the two statutes. For example, with respect to race discrimination, Title VII and Section 1981 coexist despite partially overlapping coverage. *See Johnson,* 421 U.S. at 459–61, 95 S.Ct. 1716. The IRCA and Section 1981 can similarly coexist with respect to alienage discrimination. The only purported conflict that appellees identify is the fact, alluded to in *Bhandari,* 829 F.2d at 1351, that the IRCA expressly exempts "illegal" aliens from coverage whereas Section 1981 does not. Thus, according to appellees, applying Section 1981 to claims of private alienage discrimination would "lead to the absurd result of holding liable under Section 1981 employers who refuse to hire undocumented aliens in order to comply with IRCA Section 1324a." Appellees' Brief at 30. We disagree. If an employer refuses to hire a person because that person is in the country illegally, that employer is discriminating on the basis not of alienage but of noncompliance with federal law.

CONCLUSION

For the reasons stated, we hold that 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, provides a claim against private discrimination on the basis of alienage. We therefore reverse.