Barbara GREEN, Plaintiff,

v.

GENERAL MOTORS CORPORATION, Defendant.

No. 4:99–CV–22.

United States District Court, W.D. Michigan, Southern Division.

April 20, 2000.

---

James C. Barnes, Barnes and Barnes, PC, Bloomfield Hills, MI, for Barbara Green, plaintiff.

Ola Najar Glezen, Hardy, Lewis & Page, PC, Birmingham, MI, Johanna H. Armstrong, Rochester, MI, for General Motors Corporation, defendant.

## OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MILES, Senior District Judge.

In this action, plaintiff Barbara Green alleges that her employer, General Motors

Corporation ("GM" or "the company"), discriminated against her on the basis of her gender by disciplining her more harshly than male employees for fighting at work. Green asserts claims for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, violation of 42 U.S.C. § 1981, and violation of Michigan's Elliott–Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 *et seq.*

The matter is currently before the court on a motion filed by GM seeking summary judgment in its favor on all claims (docket no. 23). Green has opposed the motion (docket no. 27). For the reasons to follow, the court grants the motion.

### FACTS

Plaintiff, who has described herself as a "petite 40 year old single mother of two," resides in Battle Creek, Michigan. Green has worked for GM continuously since 1978. At all times relevant to this action, Green was employed as a welder at a GM facility located in Kalamazoo, Michigan.[1]

On June 20, 1995, Green went on a nine-month pregnancy-related medical leave. She returned to work on March 11, 1996. Shortly thereafter, her troubles began.

By Green's own admission, on April 15, 1996, she was involved in a "physical confrontation." "altercation," or "fight," with Margie Armstrong, another GM worker. According to Green's version of events, the "altercation" began after Green "reacted after having been insulted" by Armstrong, who had "slurred the paternity" of Green's recently born child.[2] Plaintiff's Response

---

1. After the occurrence of the events in question in this lawsuit. GM closed the Kalamazoo facility where Green worked. Green was relocated and transferred to GM's Cadillac plant in Hamtramck, Michigan, where she presently continues to work.

2. Apparently, Green was particularly upset because she had been visited at her home on the previous day by a young man named Larry Crosswright, who claimed to be the half-brother of Green's daughter. According to to Green, Crosswright told her that Armstrong had instructed him to pay a visit to Green so that Crosswright could see his "sister." According to Green, her daughter and Crosswright are indeed half-sister and half-brother; they share the same father, who happens to be another GM employee. Notwithstanding the truth of what Armstrong allegedly told Crosswright. Green indicated to Crosswright that she intended to tell Armstrong that she "didn't appreciate [Armstrong] telling him to come over to my house[.]" Green Dep. at 21–22.

to Defendant's Motion for Summary Judgment at 1.

Green has admitted that on the date in question, she was working near the "C-ring" line. Green has also admitted that at approximately 8:00 p.m. during her shift that evening, she saw Armstrong go up the stairs near the C-ring line and enter the "Spot # 10" break area, which is located adjacent to but up one level from the C-ring line. Green has further admitted that after seeing Armstrong go up the stairs to the break room, she herself left her work and went up the stairs, with the intent of talking to Armstrong. According to Green, "I noticed that she was going up the stairs and I was trying to catch her before she got completely up there." Green Dep. at 25.

As Green arrived at the top of the stairs. Armstrong was already inside the break area, seated at a picnic table. According to Green, Armstrong was holding a newspaper and talking with her cousin, Annette Gardner. Green went over to Armstrong and began talking to her, attempting to engage Armstrong in conversation about the latter's alleged remarks about the paternity of Green's child. Green Dep. at 25–26. Armstrong, however, indicated that she did not wish to discuss the matter, becoming "loud" and ultimately making what Green considered to be a "threatening move." *Id.* at 28. After that, the two began what Green deems "scuffling and having a physical fight." *Id.* Green admits that she herself struck the first blow. *Id.* at 30. The fight ended with both Green and Armstrong on the ground, with Green on top of Armstrong. *Id.* at 32. The incident was apparently brief, but ended only after a male hourly employee intervened to break it up. *Id.* at 32–33. Afterward, Armstrong, whose glasses were broken during the incident, was treated both at the plant medical department and at a local hospital for a laceration over her left eye, swollen eyes, and contusions on her chest, breasts, and left leg.

According to Green's deposition testimony, after the incident she left the break area, went back down the stairs, and proceeded to an area known as the "press room," in order to eat her lunch. *Id.* at 33–34. After having lunch, Green went back to work on the C-ring line. *Id.* at 37.

Shortly after Green returned to the C-ring line, she was involved in another incident of fighting, this time with yet another GM worker. JoAnn Ray, who Green knew to be the cousin of Margie Armstrong. According to Green. Ray "inappropriately" went to Green's work area in order to assault her.[3] Plaintiff's Brief in Support of Her Response to Defendant's Motion for Summary Judgment at 1; Green Dep. at 40. However, although Green is quick to point out that Ray came to *her*, she admits that she was an active participant in the altercation; according to Green. "we was fighting." Green Dep. at 41. Green's version of the events is that Ray struck her first, after having approached her from behind. *Id.* Before even turning around. Green managed to push Ray onto the ground. *Id.* at 41, 44. According to Green, after Ray got up "she came at me again and that's when we started swinging." *Id.* at 44. Like the incident with Armstrong, the fight with Ray ended only after other GM workers managed to break it up. *Id.* at 45. Afterward, Green's immediate supervisor. Julia Hoskins, a general supervisor, Ann Thrasher, and the

---

**3.** Green has testified that Ray was employed in the press room. Green Dep. at 40. As noted above. Green claims to have eaten her lunch in the press room immediately after the incident with Armstrong. *Id.* at 34.

It is unclear how Ray learned of the fight between her cousin and Green. However, what is clear is that Ray must have known about the fight before approaching Green, for other evidence of record places Ray in the plant medical department with Armstrong shortly after Armstrong was taken there for treatment of her injuries. The evidence also indicates that Ray, while in the medical department before confronting Green, was extremely upset about what had happened to her cousin.

superintendent of the metal assembly department. Art Thompson, approached Green and instructed her to leave the plant. *Id.* at 48.[4] Ray was also asked to leave.

Green was suspended pending the completion of an investigation of the events of April 15, 1996. After the investigation was completed, Green was informed that her penalty for assaulting Armstrong was a two-week disciplinary layoff. She was instructed to return to labor relations after serving this penalty, to discuss her penalty for the second altercation, the one involving Ray. On April 30, 1996, Green returned to labor relations and was informed that her penalty for fighting with Ray was a 30-day disciplinary layoff. Thus, Green ultimately received penalties totalling 44 days of disciplinary layoff.[5] JoAnn Ray was given a one-week disciplinary layoff for her involvement in the fight with Green.

After an investigation by the Kalamazoo County Sheriff's Department, Green was charged and subsequently pleaded no contest to misdemeanor assault for her participation in the incident involving Armstrong. Armstrong and her husband also filed a civil suit against Green, obtaining,

during the proceedings, a Personal Protection Order prohibiting Green from approaching Armstrong either in public or at their mutual workplace. Green eventually settled the civil suit by agreeing to pay Armstrong damages totaling approximately $ 2,500.

Green filed a charge with the Michigan Department of Civil Rights ("MDCR") on May 1, 1996, alleging that GM had discriminated against her on the basis of her gender by unfairly disciplining her for the events of April 15, 1996. In her charge, Green alleged that she was aware of a male employee who had been involved in several fights at work, who had never been suspended for a period longer than five days. On August 17, 1998, the MDCR dismissed the charges for lack of evidence. Next, Green asked the Equal Employment Opportunity Commission ("EEOC") for a substantial weight review of the MDCR investigation. After a review, the EEOC concurred with the MDCR's finding. On December 3, 1998, the EEOC issued a determination letter which concluded the processing of her charge.

## ANALYSIS

Summary judgment is proper where "the pleadings, depositions, answers to in-

---

**4.** According to Hoskins, she was informed of the first incident with Armstrong when she encountered Armstrong, accompanied by Gardner, shortly thereafter while the latter two women were en route to the plant medical department. Armstrong, holding her broken glasses in her hand, advised Hoskins that Green had hit her. Hoskins then went to confront Green, and found her not in her work area. Upon encountering Green in another area of the plant. Hoskins asked Green if she had been involved in a confrontation. Green denied knowing what Hoskins was talking about, and also denied having had a confrontation with Armstrong. Hoskins then instructed Green to return to her own work area and stay there. At the time of the second incident, involving Ray, Hoskins had returned to the C-ring area to check on Green's whereabouts. Hoskins, who was still in the vicinity at the time of the fight between Ray and Green, assisted in trying to calm Green after other employees had managed to separate Green and Ray.

**5.** Green's employment with GM is subject to a collective bargaining agreement, and GM argues that as a result of numerous grievances which Green filed under the process provided for in the bargaining agreement. GM and Green reached a settlement, the result of which was that the discipline was left on Green's record, with the penalties reduced from a two-week disciplinary layoff ("DLO") to a one-week DLO, and from a 30-day DLO to a two-week DLO, respectively (amounting to a total penalty of 21 rather than 44 days). GM also argues that as part of the settlement, it paid Green $ 5,718.34 to fully compensate her for her lost time, including overtime. In her response, Green has not disputed that "[t]hrough the collective bargaining grievance process, [she] has been awarded most of [the] time that she was illegally deprived of[.]" Plaintiff's Brief at 6, n. 1. However, Green also argues that the settlement represents GM's concession that she was "punished too severely." *Id.*

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). While inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are "material." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### 42 U.S.C. § 1981 Claim

In Count III of her second amended complaint, Green alleges that GM "entered into an implied and express contract with male employees ... which provides that males receive one (1) week suspensions for a fighting incident." Second Amended Complaint, ¶ 38. Green also alleges that she was denied this "contractual right extended to male employees" when she was subjected to discipline far more severe for engaging in the same conduct. *Id.*, ¶ 39.

According to Green, GM's denial to her of an "equal right to enter into and enforce contracts" is in violation of 42 U.S.C. § 1981. GM, however, argues in its motion that Green's allegations fail to adequately plead a claim under § 1981 because allegations of gender discrimination do not support an action under that statute.

Title 42 U.S.C. § 1981 provides in pertinent part as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Because this statute, "on its face, is limited to issues of racial discrimination in the making and enforcing of contracts, courts have concluded that sex-based claims are not cognizable under 42 U.S.C. § 1981." *Anjelino v. New York Times Co.*, 200 F.3d 73, 98 (3d Cir.1999) (footnote and citations omitted); *see also Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir.1998) ("It is also settled that Section 1981 does not prohibit discrimination on the basis of gender or religion, ... national origin, ... or age") (citations omitted), *cert. dismissed,* —— U.S. ——, 119 S.Ct. 2418, 144 L.Ed.2d 789 (1999).

■ Green's claim under § 1981, as alleged in her second amended complaint, is based solely on gender discrimination. However, such a claim is not cognizable under that statute. In her response to GM's motion, Green has not even attempted to defend this claim, nor does it appear that she could do so in good faith. Under the circumstances, the court concludes that GM is entitled to summary judgment in its favor on Green's claim based on 42 U.S.C. § 1981.

## Title VII Claim

In Count I of her second amended complaint, Green asserts a claim against GM of gender discrimination in violation of Title VII. In its motion, GM argues that Green's claim of disparate treatment based on gender is subject to dismissal as a matter of law because Green has failed to show that she was treated less favorably than similarly situated male employees.

In Title VII cases involving allegations of disparate treatment in which there is no direct evidence of discrimination, the court must apply a familiar three-part analysis:

(1) the plaintiff must establish a prima facie case of [sex] discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was in fact pretextual.

*Harrison v. Metro. Government of Nashville*, 80 F.3d 1107, 1115 (6th Cir.) (applying analysis to claim of race discrimination) (citations omitted), *cert. denied,* 519 U.S. 863, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996).

In satisfaction of the first part of this analysis in cases of alleged discriminatory discipline, a plaintiff may establish a prima facie case by showing that (1) she belongs to a protected class; and (2) for the same or similar conduct, she was treated differently than similarly-situated non-protected employees. *Id.* "The Supreme Court has noted that in comparing employment discipline decisions, 'precise equivalence in culpability between employees' is not required.... Rather, the plaintiff must simply show that the employees were engaged in misconduct of 'comparable seriousness.'" *Id.* (citations omitted); *see Noland v. Lorain Bd. of Education,* 869 F.Supp. 529, 531 (N.D.Ohio 1994) ("To make out a prima facie case, the plaintiff

must also establish that similarly situated employees engaged in conduct that was comparably serious to plaintiff's conduct. However, in making a showing of comparable seriousness, the plaintiff does not have to show 'precise equivalence in culpability' "). However, in order to be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare her treatment be "similarly-situated *in all respects* [,]" and thus,

to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992) (citations omitted).

GM argues that Green's claim of gender discrimination lacks merit because she cannot identify any male employee who engaged in the same or comparably serious conduct and received more favorable treatment. In her response, Green argues that she has been able to single out four males for "comparability purposes." Plaintiff's Brief at 6.[6] These males are apparently Earl Crenshaw, Joseph Clayton, Winston Malcolm, and Philip Audette.

Green finds the most fault in her treatment compared to that allegedly afforded Crenshaw and Clayton. Green describes Crenshaw as "perhaps the heavyweight champion of the Kalamazoo GM plant," and refers to Clayton as "the number one contender." Green argues that Clayton "had been disciplined at least 17 times for fighting." Plaintiff's Brief at 2. However, the evidence to which Green cites in support of this statement—page 78 of the

---

6. Green argues that these "comparables" are merely "representative," for, according to her, "[m]ales squared off and rushed one another on a fairly consistent basis at [the] plant[.]" Plaintiff's Brief at 6, n. 2. For pur-

poses of resolving the current motion, however, the court can consider only those comparables whom Green has identified and for which she has provided evidence.

deposition of Jack Smith—merely indicates that Clayton had 17 *infractions* on his disciplinary record; it does not state that all were for fighting.[7] In contrast, GM's exhibits indicate that Clayton's disciplinary record consisted of one suspension for fighting in June, 1996—later converted to a one-week disciplinary layoff—and another one-week disciplinary layoff for fighting approximately 11 years earlier, in October, 1985. (His record also includes two other non-fighting infractions.) Crenshaw's disciplinary record includes three one-week disciplinary layoffs for fighting since 1992 (in July, 1992; in September, 1993; and in March, 1996). (Clayton's record also includes several other non-fighting infractions dating as far back as 1979, over 20 years ago.) The records for both Clayton and Crenshaw also indicate the existence of "Discipline Settlement Agreements," under which GM agreed with the employees' union to "clear" the employee's record of the discipline after the passage of a specified period of time without commission of further infractions. It is also noted that Green has not supplied evidence indicating that any pre–1996 disciplinary infractions by these other employees would have been handled by the same decision-maker(s) handling Green's April, 1996 infractions.

Green has submitted an affidavit in which she states that even when males did receive a one-week layoff for fighting, this period was usually "reduced to less than a week actually off." Green Affidavit, ¶ 8. The testimony also indicates that on occasion, a settlement might be reached—presumably with the union—to bring an employee back early from a disciplinary penalty. Smith Dep. at 73.[8]

As for Phillip Audette, the evidence submitted by Green reflects a record containing numerous infractions dating back to 1979, but only one suspension for fighting, in June, 1996—later converted to a one-week disciplinary layoff. (This appears to be for involvement in the same fight for which Clayton was disciplined in June, 1996.) Similarly, Winston Malcolm's record contains only one listed infraction, for fighting, for which a one-week disciplinary layoff was imposed in March, 1996. (This appears to be for involvement in the same fight for which Crenshaw was disciplined that same month.)

Green's response to GM's motion indicates a flair for the dramatic. For example, she argues that

> Fighting, mainly involving males, was part and parcel of the industrial, cultural fabric at the GM Kalamazoo plant. Eyes have been gouged out, skulls and ribs cracked, men thrown out of windows, and Earl Crenshaw, a strong willed, explosively violent black male, literally terrorized a mild mannered white male employee until finding the torment unbearable, the white employee became severely depressed and committed suicide.

Plaintiff's Brief at 1. Green accuses Crenshaw of "murder," and Clayton of "mayhem and maiming." *Id.* at 7. However, a party opposing a well-supported motion for summary judgment earns no points for dramatic license; facts and evidence are what count. Green has pointed to no facts which are admissible in evidence indicating that Crenshaw murdered anyone; instead, she has submitted only a copy of a letter to GM management, written by an employee named Gregory Taylor in July, 1996, complaining that he had been intimidated by

---

7. Subsequently in her brief, Green acknowledges that GM's exhibits reflect a lesser number of disciplinary infractions. Plaintiff's Brief at 7.

8. As noted above, although the record reflects that Green filed a number of grievances in connection with the discipline imposed on her, the first such grievance does not appear

to have been filed until April 23, 1996—eight days after Green was initially suspended. Moreover, also as noted above, Green's grievances were eventually settled, with the first infraction being amended on her record to reflect a one-week layoff, and the second being amended to reflect a two-week layoff.

Crenshaw at the plant approximately one week earlier. Taylor's letter also complains that Crenshaw beat him up at work for no reason in 1989, wasn't disciplined for it (no witnesses would confirm Taylor's complaint), and had continued to harass Taylor ever since. Taylor's letter further alleges that Crenshaw had "violently attacked" an individual named Mark Kloosterman, who later "committed suicide after a year of constant legal litigation (assault & battery)." Plaintiff's Exhibit 9.

As noted above, however, Crenshaw and Clayton have both been disciplined for fighting, as was Green. Moreover, as GM has noted, Green has not identified a single male employee who, like her, was involved in two altercations with different employees *on the same day.* In this significant respect, Green is therefore not similarly situated to Crenshaw, Clayton, Audette, or Malcolm, for her situation is, as far as is known, entirely without precedent. GM is not obligated to treat separate incidences of violence identically, when the evidence and context shows that they simply are not similar. *See Ward v. Procter & Gamble Paper Prod. Co.,* 111 F.3d 558, 561 (8th Cir.1997) (affirming grant of summary judgment in favor of employer in Title VII action alleging race discrimination based on plaintiff's being disciplined less severely than a white employee after involvement in an argument; evidence showed that white employee grabbed plaintiff's finger as it was being pointed in her face, while plaintiff escalated the argument by slapping the White employee).

■ . What Green has chosen to do, rather than to present facts showing that she is indeed similarly situated to any of these alleged male comparables, is to rely on the treatment afforded Armstrong and Ray as evidence of pretext. Green's view is that if GM deems fighting, particularly unprovoked fighting, to be so bad, then why weren't these two individuals penalized more seriously? However, before establishing pretext, Green must first establish a prima facie case of gender discrimination. For the reasons already discussed, the court concludes that Green has not established a prima facie case because she has failed to show that she was treated less favorably than one or more similarly situated male employees. Moreover, even viewed as evidence of pretext, Green's reliance on the treatment afforded Armstrong and Ray is fatal to her case. Armstrong and Ray are both females. Assuming that Armstrong bore any responsibility for playing a part in the altercation with Green, Armstrong was not disciplined at all. Ray, who clearly played an active role in her altercation with Green, received the same disciplinary sanction as did Crenshaw, Clayton, Audette, and Malcolm for incidents of fighting: a one-week layoff. The court fails to comprehend how GM's treatment of Armstrong and Ray is in any way supportive of Green's claim of gender discrimination.

Here, the evidence shows that Green was involved in two incidents of fighting on the same day, for which she was disciplined. Green has pointed to no male employees who, like her, have been involved in two instances of fighting on GM premises on the same day, but who have been less severely disciplined. The evidence shows that Green's situation is unique, and that GM was justified as treating it as such. Under the circumstances, the court concludes that the record fails to establish a prima facie case of gender discrimination.

### State Law Claim under Michigan's ELCRA

Green's second amended complaint includes a state law claim for violation of Michigan's ELCRA, a claim over which the court has supplemental jurisdiction. Because Michigan courts have looked to Title VII in construing the ELCRA, *see Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1311–12 (6th Cir.1989), and because the court has concluded that summary judgment must be granted in GM's favor on Green's claim of discrimina-

tory suspension, the court also concludes that summary judgment must be granted in favor of GM on Green's identical claim under the ELCRA.

## CONCLUSION

For the foregoing reasons, the court grants GM's motion for summary judgment, and dismisses this action with prejudice in its entirety.