**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 21-2211**

—————————

ALDO DE LEON RESENDIZ, individually and on behalf of all others similarly situated,

Plaintiff - Appellant,

v.

EXXON MOBIL CORPORATION,

Defendant - Appellee.

—————————

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Richard E. Myers, II, Chief District Judge. (5:20-cv-00692-M)

—————————

Argued: October 28, 2022                    Decided: July 10, 2023

—————————

Before RICHARDSON and QUATTLEBAUM, Circuit Judges, and FLOYD, Senior Circuit Judge.

—————————

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Judge Quattlebaum and Senior Judge Floyd joined.

—————————

**ARGUED:** Thomas Andrew Saenz, MEXICAN AMERICAN LEGAL DEFENSE & EDUCATIONAL FUND, Los Angeles, California, for Appellant. Elbert Lin, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Appellee. **ON BRIEF:** Andres R. Holguin-Flores, Deylin O. Thrift-Viveros, Los Angeles, California, Rosa G. Saavedra Vanacore, Washington, D.C., Leticia M. Saucedo, MEXICAN AMERICAL LEGAL DEFENSE & EDUCATIONAL FUND, Sacramento, California, for Appellant. Juan C. Enjamio, Daniel J. Butler, Miami, Florida, David M. Parker, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

Aldo De Leon Resendiz is an alien who challenges Exxon Mobil Corporation's hiring policy as discriminatory. De Leon received deferred deportation and eligibility for temporary work authorization under the Deferred Action for Childhood Arrival program. While a student at North Carolina State University, he was recruited by ExxonMobil for an internship. De Leon told ExxonMobil that he is not a United States citizen, but erroneously represented that he had permanent work authorization under federal law. Consistent with a company policy allowing citizens and noncitizens alike to be hired so long as they had permanent work authorization, ExxonMobil offered De Leon the internship. De Leon accepted. But, when De Leon submitted his paperwork, it showed that he lacked permanent work authorization. So—consistent with its policy— ExxonMobil rescinded its offer.

De Leon claims that ExxonMobil's policy discriminates against aliens as prohibited by 42 U.S.C. § 1981. But § 1981 only protects against intentional discrimination, and De Leon fails to allege that ExxonMobil intentionally discriminates against aliens. While ExxonMobil's policy requiring that applicants have permanent work authorization will only exclude aliens, discriminatory impact is not enough. And, given ExxonMobil's policy, De Leon did not plausibly allege that ExxonMobil intended to discriminate against aliens. De Leon has thus failed to state a claim for alienage discrimination.

## I.    Background

De Leon illegally entered the United States from Mexico when he was eight. Because he had arrived as a minor, his deportation was later deferred under the DACA

2

program. *See* Memorandum from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al. (June 15, 2012); *see also* 8 C.F.R. § 236.21(c)(1) (DACA "is a form of enforcement discretion not to pursue the removal of certain aliens for a limited period in the interest of ordering enforcement priorities in light of limitations on available resources, taking into account humanitarian considerations and administrative convenience."). Deferred-action status under DACA did not grant De Leon a lawful immigration status. *See* 8 C.F.R. § 245.1(d)(1). But it permitted him to stay in the United States and allowed him to apply for temporary work authorization. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1902 (2020). De Leon was granted temporary work authorization, which means he was no longer an "unauthorized alien" that employers must not knowingly employ, because an "unauthorized alien" excludes aliens "authorized to be so employed by this chapter or by the Attorney General." 8 U.S.C. §1324a(a), (h)(3).[1]

De Leon remained in the United States and attended North Carolina State University where he excelled as an engineering student. ExxonMobil came to the University to give a presentation to the Society of Hispanic Professional Engineers. After that presentation, De Leon applied for an internship. On his application, he accurately represented that he

---

[1] The Immigration & Nationality Act prohibits employers from knowingly hiring aliens who are not authorized to work in the United States. *See* 8 U.S.C. § 1324a. This ban is enforced through an employment verification system designed to deny employment to unauthorized aliens. *Hoffman Plastic Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 147 (2002). Authorization to work requires a social-security-account-number card or other documentation evidencing employment authorization. *Id.* at 147 n.3.

was a Mexican citizen who was authorized to work in the United States. But he erroneously represented that his work authorization was permanent.

ExxonMobil interviewed De Leon and offered him the internship at its Baton Rouge facility. The offer was explicitly "contingent upon the verified, satisfactory completion of requirements outlined in the Conditions of Employment." J.A. 9. These conditions included having permanent authorization to work in the United States, supported by proper "documentation." J.A. 9–10.

De Leon lacked this required authorization. Recall that DACA does not provide recipients with legal immigration status. It only defers any enforcement action. A DACA recipient's work authorization turns not on their immigration status but on an application "for work authorization during this period of deferred action, . . . as permitted under regulations long predating DACA's creation." *Regents of the Univ. of Cal*, 140 S. Ct. at 1902. So while De Leon could—and did—receive *temporary* work authorization under those regulations, he did not have *permanent* work authorization.[2]

Though lacking the required permanent work authorization, De Leon accepted the offer.[3] ExxonMobil later contacted De Leon to remind him to provide documentation

---

[2] The Attorney General's list of employment-authorized individuals includes certain aliens with temporary-work authorization, including deferred-action recipients. *See* 8 C.F.R. § 274a.12 (c)(14). So DACA recipients are eligible to apply for temporary work authorization.

[3] De Leon was also required to complete a secondary application specific to the Baton Rouge facility. There, he again erroneously represented that he had permanent work authorization.

about his work authorization. But the only documentation that De Leon provided showed that he had temporary—not permanent—work authorization.

Around the same time, De Leon was completing an application for a Transportation Worker Identification Credential card, which the Department of Homeland Security requires for entry to ExxonMobil's Baton Rouge facility. These cards are available to U.S. citizens and certain noncitizens, but not to DACA recipients. *See* 49 C.F.R. § 1572.105. During the application process, De Leon realized his immigration status left him ineligible for the Credential card. So he contacted ExxonMobil. After discussing the situation with a Human Resources representative, he was instructed to answer "Yes" to a question on the application asking if he would require sponsorship for a visa or employment authorization.

Soon after, De Leon received a call from ExxonMobil rescinding his internship offer. ExxonMobil followed up with a letter:

> As described in your offer letter, *a prerequisite of employment for the position you are seeking is that you have the permanent or indefinite right to work in the US* (i.e. you are a protected individual under 8 USC 1324b – you are a US citizen, US National, US Permanent Resident, US Conditional Permanent Resident, Temporary Resident . . ., Asylee, or Refugee.) We now understand based on your application modified after receiving our offer that you do not meet this eligibility requirement.

J.A. 12 (emphasis added).

In response, De Leon sued ExxonMobil under § 1981. He alleged its policy was facially discriminatory. ExxonMobil moved to dismiss the complaint. The district court granted the motion, reasoning that ExxonMobil's hiring policy does not exclude applicants based on alienage. De Leon timely appealed.

5

## II.      Discussion

We review a district court's dismissal of a complaint de novo. *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). In doing so, we assume that the facts set out in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). To survive a motion to dismiss, De Leon must establish that § 1981 contains an implied private right of action for alienage discrimination. His complaint must also plausibly allege that ExxonMobil intentionally discriminated against him on the basis of alienage. Addressing each issue in turn, we hold that—under our precedent—§ 1981 contains a private right of action for alienage discrimination, but that De Leon has failed to plausibly allege that ExxonMobil intentionally discriminated against him based on his alienage. So we affirm the district court's dismissal of his suit.

### A.      Section 1981's implied cause of action

Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." § 1981(a). And that right is specifically "protected against impairment by nongovernmental discrimination." § 1981(c); *see Duane v. GEICO*, 37 F.3d 1036, 1038–41 (4th Cir. 1994). De Leon argues that § 1981 contains an implied private right of action for alienage-based discrimination in contracting.

The text of § 1981 does not address discrimination in contracting. It only ensures that all persons have the same legal capacity "to make and enforce contracts." § 1981(a). But the Supreme Court "has broadened the coverage of § 1981 far beyond the scope

6

actually intended by its authors" by "convert[ing] a statutory guarantee of equal rights into a grant of equal opportunities." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 406 (1982) (Stevens, J., concurring in part and concurring in the judgment) (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) and *Runyon v. McCrary*, 427 U.S. 160, 189 (1976)).  So we now read the statute to prohibit the refusal to enter a contract with someone based on a protected reason.  *Patterson v. McLean Credit Union*, 491 U.S. 164, 176–177 (1989).

The text also does not provide a cause of action to enforce the protections it guarantees.  *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020) ("Nothing in the Act specifically authorizes private lawsuits to enforce the right to contract.").  Even so, the Supreme Court "created a judicially implied private right of action" under § 1981 for race-based discrimination in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459 (1975).  *See Comcast*, 140 S. Ct. at 1015.

Though the Supreme Court has expanded § 1981's protections and implied a private right of action, it has not yet held that it encompasses alienage-based discrimination.[4]  But the Fourth Circuit has squarely done so.  In *Duane* we held that § 1981 protects aliens and

---

[4] The Supreme Court has neither said that the implied cause of action extends to enforce protections against alienage-based discrimination nor said that § 1981 protects against alienage-based discrimination at all.  *See Anderson v. Conboy*, 156 F.3d 167, 176 (2d Cir. 1998) (noting "the Supreme Court has never squarely held that Section 1981 bars discrimination . . . on the basis of alienage").

that the private right of action reaches alienage-based discrimination. 37 F.3d at 1043.[5] In that case, GEICO refused to sell Duane a home-insurance policy because he was not a United States citizen. *Id.* at 1037. After tracing § 1981's origins back to the Civil Rights Act of 1866, we concluded that the law protects aliens from such discrimination and extended the implied right of action. *Id.* at 1038–43.

ExxonMobil argues that *Duane* should not apply here because Duane himself was a "lawfully admitted, permanent resident alien." *See id.* at 1037. Indeed, De Leon is not lawfully present in the United States. But this distinction makes no difference under *Duane*. *Duane* did not turn on the lawfulness of the plaintiff-alien's presence in the United States. The court repeatedly noted that aliens were protected without limiting that protection to lawfully admitted aliens. *See id.* at 1040 (holding that § 1981 prohibits "private discrimination against aliens"); *id.* at 1043 ("[W]e conclude that . . . section 1981 prohibit[s] private discrimination against aliens"); *id.* (explaining that case law "compel[s] us to find that section 1981 prohibits private discrimination against aliens").

This is consistent with Supreme Court precedent that certain legal protections extend to aliens, whether legally present or not. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law."). And

---

[5] Some other circuits agree. *See, e.g.*, *Anderson*, 156 F.3d at 180; *Wright v. Southland Corp.*, 187 F.3d 1287, 1297 n.12 (11th Cir. 1999). And the statute's juxtaposition of "[a]ll persons" with "white citizens" supports this reading. *See* § 1981(a).

*Duane*'s reasoning even relied on how odd it would be to distinguish among individuals while applying a statute that extends protections to "[a]ll persons." *See Duane*, 37 F.3d at 1043 (citing *Runyon*, 427 U.S. at 206 (White, J., dissenting) ("[Section 1981] draws no such distinction between classes of persons. It logically must be construed either to give 'all persons' a right not to be discriminated against by private parties in the making of contracts or to give no persons such a right.")).

As *Duane*'s holding cannot be read to support the distinction ExxonMobil asks us to draw, we are bound by *Duane*'s recognition that an implied private right of action exists for all aliens to enforce § 1981's prohibition on alienage-based discrimination. *See Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021).

### B.    Alienage discrimination

To prove his § 1981 claim, De Leon must establish that (1) the defendant intended to discriminate on the basis of alienage, (2) the discrimination interfered with a contractual interest, and (3) the interference with a contractual interest would not have happened but for the plaintiff's alienage. *See Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006); *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022). So to survive a motion to dismiss, De Leon's complaint must plausibly allege facts that, if true, allow us to reasonably infer that all three elements are met. *See Nadlendla*, 24 F.4th at 305.

De Leon's claim fails at the first step: he fails to plausibly allege intentional discrimination. The Supreme Court has been clear: Section 1981 "can be violated only by *purposeful* discrimination." *Gen. Bldg. Contractors*, 458 U.S. at 391 (emphasis added). The statute "is limited to conduct motivated by a discriminatory purpose" and does not

9

extend to a policy with only a discriminatory impact. *Id.* at 386; *see also Ashcroft v. Iqbal,* 556 U.S. 662, 676–77 (2009) ("[P]urposeful discrimination requires . . . a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' adverse effects upon an identifiable group." (quoting *Pers. Adm'r of Mass v. Feeney*, 442 U.S. 256, 279 (1979))).   Here, De Leon's allegations fail to show that ExxonMobil intentionally discriminated against him, so he fails to state a § 1981 claim.

There are several ways that an employee can plausibly allege intentional discrimination.  He might point to a policy that expressly distinguishes between employees based on a protected characteristic:  for example, a job advertisement reading "No Irish Need Apply."  Or the employee could challenge a policy that distinguishes between employees based on a proxy for a protected characteristic.  In that scenario, the employee can allege intentional discrimination only if the supposed proxy both overlaps with the protected characteristic and is "such an irrational object of disfavor" that we can presume the policy meant to disfavor the protected class:  so "[a] tax on wearing yarmulkes is a tax on Jews."[6]  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993).  The employee may alternatively allege facts, apart from just the policy's terms, that would allow us to infer a discriminatory motive against the employee's protected trait.  *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

---

[6] Disparate impact alone is not enough to prove intent. *Cf. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609–10 (1993); *Geduldig v. Aiello*, 417 U.S. 484, 497 n.20 (1974).

But De Leon does not attempt to allege intentional discrimination through these traditional means. He does not allege that the policy blatantly tells aliens that they need not apply. Nor could he, since ExxonMobil extended him an offer despite knowing that he was an alien. He does not allege that requiring permanent work authorization is an irrational way to choose employees and so qualifies as a proxy for alienage. And he does not allege—indeed he has affirmatively disclaimed—that there are any facts beyond the policy itself supporting an inference of intentional discrimination. *See* Appellant's Reply Br. at 5–6.

Still, De Leon argues that ExxonMobil intentionally discriminated against him because its policy—though not barring aliens—relies on alienage. To make this argument, he points to *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). In that case, the Court used an example—an employer who fires homosexual employees—to illustrate how an employer's policy can "inescapably intend[ ]" to rely on a protected characteristic without naming that characteristic. *Bostock*, 140 S. Ct. at 1742. An employer with a no-homosexuals policy imposes different outcomes on employees based purely on their sex, a protected characteristic. That policy can be pursued only by reference to sex: a man who is attracted to a man is fired but a woman who is attracted to a man is not. Said differently, there is a trait (attraction to men) that the employer tolerates in women but not in men. This, *Bostock* tells us, is intentional discrimination based on sex. *See id.* at 1746 ("By discriminating against homosexuals, the employer intentionally penalizes men for being attracted to men and women for being attracted to women.").

11

So, when an employer imposes a policy that leads to different outcomes between otherwise identical employees based purely on the employees' protected characteristic, we know the employer intentionally discriminates based on that characteristic. *See id.* at 1741. To figure out whether we're faced with such a policy, we "change one thing at a time"—specifically, the employee's protected trait—"and see if the outcome changes." *Id.* at 1739. In *Bostock*, if the male employee attracted to men was changed to a woman attracted to men, the woman would not be fired. This different treatment is intentional discrimination's hallmark. When two people who are "materially identical" except for a protected trait, and one is treated differently because of that trait, then "[t]here is simply no escaping the role intent plays." *Id.* at 1741–42; *see also Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (per curiam) (comparing men and women who both have young children).

An *intentional* difference in treatment is exactly what De Leon cannot allege. In order for *Bostock*'s analysis to work, the plaintiff needs to allege that—aside from his protected trait—he is "materially identical" to another employee who is treated differently. *See Bostock*, 140 S. Ct. at 1741. De Leon is an alien with temporary work authorization. In *Bostock*'s terms, he is like a man attracted to a man. *Bostock* changed that man into a woman who was still attracted to a man and compared outcomes. So we would need to change De Leon into a citizen who still possessed only temporary work authorization and then compare outcomes.

But we encounter a problem: That category—citizens with temporary work authorization—does not exist. And there is nothing in the complaint suggesting that ExxonMobil would have been willing to hire a citizen if, hypothetically, he did not have

12

permanent work authorization. As a result, De Leon has not plausibly alleged that ExxonMobil tolerates a trait—temporary work authorization—in citizens that it does not in aliens. So he has not alleged facts that, even if accepted as true, establish intentional discrimination under *Bostock*.

To understand *Bostock*'s "inescapable" intentionality, consider what happened here. ExxonMobil hired De Leon despite knowing he was an alien. So its policy does not facially screen out all aliens. And ExxonMobil revoked his offer only after learning that he lacked permanent work authorization. Without any indication whether ExxonMobil would also revoke an offer to a citizen who it likewise discovered lacked permanent work authorization, De Leon cannot plausibly allege that ExxonMobil treated him worse than a citizen. Maybe the impact of ExxonMobil's policy requiring permanent work authorization is felt only by aliens. But discriminatory impact alone does not suffice. The discrimination must be intentional. *See Gen. Bldg. Contractors*, 458 U.S. at 391; *Bostock*, 140 S. Ct. at 1740. As the Supreme Court explained, it is not enough for one's status to relate to a protected class "in some vague sense" or for discrimination based on the status to have "some disparate impact" on the protected class. *Bostock*, 104 S. Ct. at 1742. Thus, De Leon has not plausibly alleged intentional discrimination under *Bostock*.

ExxonMobil's internship policy targets long-term employees. It does not—and could not—draw lines around which aliens are eligible for that long-term employment. That determination is left to someone else: Congress. If Congress changed the law tomorrow to make all aliens eligible for long-term employment, then without changing a single word in the challenged policy, all aliens would be eligible for employment at

13

ExxonMobil.  So it cannot be that ExxonMobil's policy, standing alone, creates a reasonable inference of intentional discrimination against aliens.  Rather than grant permanent work authorization to all aliens, the federal government limits the categories of aliens eligible for long-term employment.  *See* 8 C.F.R. § 274a.12.  And—it's worth recalling—the federal government also limits the categories of aliens eligible to access the Baton Rouge facility.  *See* 49 C.F.R. § 1572.105.  So, even without ExxonMobil's policy, De Leon couldn't work at the facility he was hired for.  These are the federal government's decisions, not ExxonMobil's.  And there is no principle by which we could impute to ExxonMobil a discriminatory intent based on them.

*          *          *

Under *Duane*, § 1981's implied cause of action extends to De Leon's claim.  But that claim fails.  True, a hiring policy that looks at whether the applicant has permanent work authorization under federal law will only bar aliens.  Yet that does not mean the policy intentionally discriminates based on alienage.  De Leon has failed to allege any theory that could allow us to find intentional discrimination here.  So the district court's order dismissing De Leon's complaint is

*AFFIRMED.*